# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW WALDROP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 06031 |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | Judge Edmond E. Chang |
| IMHOTEP CARTER, ANNA McBEE, | ) | |
| ANTON DUBRICK, CYNTHIA GARCIA, | ) | |
| ADRIENNE MILLER, and DELORES | ) | |
| TREVINO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this 42 U.S.C. § 1983 civil-rights action, Plaintiff Andrew Waldrop brings claims for deliberately indifferent medical treatment in violation of the Eighth and Fourteenth Amendments.[1] Waldrop, who is diabetic, alleges that he was deprived of insulin by various prison health officials while he was incarcerated by the State of Illinois. Waldrop has named as Defendants: two state employees, counselor Anna McBee and Registered Nurse Delores Trevino (the Illinois Defendants); as well as Wexford Health Sources, Inc., a private company that is contracted to provide healthcare to state prisoners, and four of its employees, Doctors Anton Dubrick and Imhotep Carter and Registered Nurses Cynthia Garcia and Adrienne Miller (the

---

[1]Jurisdiction over the federal claims is proper under 28 U.S.C. § 1331. Waldrop initially raised state-law medical malpractice claims as well, but these were dismissed after Waldrop failed to submit the necessary supporting affidavit. R. 45, Minute Entry dated Jan. 29, 2013. Waldrop was given leave to re-file the state-law claims with the proper affidavit but declined to do so.

Wexford Defendants).[2] Both sets of Defendants now move for summary judgment on Waldrop's constitutional claims. For the reasons set forth below, the motions are granted.

## I. Background

In deciding Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to the Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Andrew Waldrop is an inmate at Illinois's Stateville Correctional Center. R. 128, PSOAF to Ill. DSOF ¶ 1; R. 117, Ill. DSOF ¶ 1.[3] He suffers from Type 1 diabetes and has been dependent on insulin since 1977. PSOAF to Ill. DSOF ¶ 2. Waldrop alleges that he was the victim of deliberately indifferent treatment related to this condition, based on a number of incidents that occurred in 2010 and 2011. Wexford DSOF ¶ 4. Waldrop filed a total of six grievances with Stateville authorities during this time about the allegedly unlawful conduct.

---

[2]The amended complaint named the corporate entity as Wexford Health "Services," Inc. and spelled Carter's first name as Imotep. *See* R. 21, Am. Compl. The Court refers to the correct corporate name and spelling of Carter's name as provided by the Defendants in their submissions.

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are "Ill. DSOF" (for the Illinois Defendants' Statement of Facts), "PSOAF to Ill. DSOF" (for Waldrop's Statement of Additional Facts to the Illinois Defendants' Facts), "Wexford DSOF" (for the Wexford Defendants' Statement of Facts) [R. 124], and "PSOAF to Wexford DSOF" (for Waldrop's Facts in addition to the Wexford Statement) [R. 138]. The Court cites to a party's response to one of these Statements where a fact is disputed; where only the proponent party's Statement is cited, the asserted fact is either unchallenged or noted as being merely that party's allegation.

## A. First Grievance: Miller

On November 20, 2010, Waldrop filed his first grievance, charging that Adrienne Miller had withheld insulin from Waldrop because he had refused to first undergo "accu-check" testing. PSOAF to Ill. DSOF ¶ 6.[4] Miller was a nurse employed by Wexford Health Sources, Inc. at Stateville. Wexford DSOF ¶ 45. An accu-check is a small device that pricks the finger and instantaneously measures blood sugar. R. 124-1, Carter Dep. Tr. at 20:7-14. According to Waldrop's deposition testimony, Miller, along with another unidentified nurse, arrived at Waldrop's cell to administer his insulin but "started getting loud and belligerent." R. 124-5, Waldrop Dep. Tr. at 82:1-4. Miller refused to give Waldrop the insulin until he was accu-check tested (the nurse passes the device through the cell bars to the inmate to administer the test himself), which Waldrop refused because, in his words, "[s]ometimes a diabetic don't want to do it." *Id*. at 83:10-12. Miller then left without administering any insulin. *Id*. at 84:8-9. Waldrop asserts that this action was improper, relying on the testimony of another nurse, who said that an inmate who refuses an accu-check test may still be provided with insulin and permitted to administer it to himself. PSOAF to Wexford DSOF ¶ 11.

---

[4]Defendants object to this factual assertion, "to the extent the narrative is being offered for the truth of the matter asserted," as hearsay. R. 133, Ill Defs.' Resp. to PSOAF ¶ 6. But this statement is not objectionable on hearsay grounds because it is asserted in part for the fact the non-hearsay purpose that Waldrop filed a grievance (an important issue given the Defendants argue later that Waldrop failed to exhaust his remedies). The same goes for similar statements related to Waldrop's other grievances and follow-up submissions, to which Defendants object on the same grounds. Moreover, although Defendants' objection to the contents of these grievances as hearsay is technically correct (when offered to prove the underlying fact assertions), it is clear that the grievances simply repeat the factual allegations made in Waldrop's complaint, and supported by his

After receiving no word in the next two months about the status of his grievance, Waldrop wrote a letter to the acting director of the Illinois Department of Corrections. PSOAF to Ill. DSOF ¶ 7. Waldrop alleges that he never received an initial Grievance Officer's Report from Anna McBee, who was Stateville's Grievance Officer as well as a counselor, in relation to his filing, *id.* ¶ 8; Defendants respond (not exactly on point to Waldrop's point that he never *received a copy*) that a Grievance Officer's Report was taken into account by the Administrative Review Board in evaluating Waldrop's complaint, Ill. Defs.' Resp. PSOAF ¶ 8. In a letter dated March 25, 2011, the Review Board notified Waldrop that his grievance would be resolved without the need of a formal hearing, and that Nurse Miller had already been informed that she could indeed administer insulin to an inmate without insisting on the use of an accu-check. PSOAF to Ill. DSOF ¶ 9; R. 128-3, Mar. 25, 2011 Ltr.

### B. Second and Third Grievances: "Dr. T" and Presence of Security

Despite this favorable resolution, Waldrop alleges that he continued to be denied insulin when he refused accu-check testing. PSOAF to Ill. DSOF ¶ 10. Specifically, Waldrop testified in his deposition that, as late as November 2011, his nurse (not one of the Defendants) reduced his insulin dosage on a doctor's orders when he refused to submit to an accu-check. Waldrop Dep. Tr. at 71:12-72:19. Waldrop suggests that he consequently submitted a second and third grievance in

---

deposition testimony. True, Waldrop would have done better to lay out these facts separate from their inclusion in the grievances (citing to his own deposition testimony about them, for instance) in his Statement of Facts. Nonetheless, with the hearsay objections to the grievance contents set to the side, the Court will consider them in Waldrop's favor.

relation to this denial of insulin, dated November 2 and November 9, 2011, respectively. PSOAF to Ill. DSOF ¶ 11. But a copy of the November 2 grievance submitted by Waldrop shows that it dealt with Waldrop's refusal to talk with a psychiatrist, Dr. T, and is unrelated to insulin. *See* R. 128-4, Nov. 2, 2011 Grievance. Likewise, a copy of the November 9 grievance shows that Waldrop complained of refusing to take his insulin in the presence of security, not of being denied the medication because of refusing to submit to an accu-check. *See* R. 128-4, Nov. 9, 2011 Grievance. Both sides agree that Delores Trevino, a supervising nurse, wrote a memo, dated February 9, 2012, about these grievances and that McBee then issued a combined Grievance Officer's Report on February 27. PSOAF to Ill. DSOF ¶¶ 12-13; Ill. Defs.' Resp. to PSOAF ¶¶ 12-13. A month later, the Review Board denied the two grievances. PSOAF to Ill. DSOF ¶ 14.

## C. Fourth Grievance: Dubrick and Carter

On November 10, 2011, Waldrop submitted a fourth grievance, this time charging that Dr. Anton Dubrick denied Waldrop insulin and refused to treat or examine him, and that Dr. Imhotep Carter also took Waldrop off his insulin, treating him instead with "pills." PSOAF to Ill. DSOF ¶ 15. Carter was employed by Wexford as the medical director at Stateville at the time. Wexford DSOF ¶ 11. Dubrick was also employed by Wexford as a Stateville physician, routinely examining and treating diabetic patients. *Id.* ¶¶ 32-33.

In the grievance, Waldrop charged that Dubrick had taken him off insulin and put him on pills (which "work if my pancreas still produced a little insulin")

because Waldrop refused to see the doctor, even though Waldrop says he did see the doctor for two minutes. R. 128-5, Nov. 10, 2011 Grievance. According to Waldrop's deposition testimony, the problem with Dr. Dubrick arose over Waldrop's disagreements with the doctor about not giving a thorough enough examination and conducting the appointment with the door open. Waldrop Dep. Tr. at 55:9-56:8 ("[Dubrick was] pissed off … [b]ecause I was telling him how to do his job in treating me."); *see also id.* at 50:12-51:6 (testifying that Dubrick did not want to check his feet, his eyes, heart rate, or breathing). Dubrick allegedly took Waldrop off his insulin for three days. *Id.* at 48:15-17. As for Dr. Carter, Waldrop's fourth grievance only obliquely noted, without foundational detail, that Dr. Carter and staff had denied Waldrop his insulin injections. Nov. 10, 2011 Grievance. McBee issued a Grievance Officer's Report related to this grievance in February 2012. PSOAF to Ill. DSOF ¶ 16; Ill. Defs.' Resp. to PSOAF ¶ 16. The Review Board denied the grievance in March 2012. PSOAF to Ill. DSOF ¶ 17.

### D. Fifth Grievance: Carter

Waldrop filed a fifth grievance on November 21, 2011, alleging that Dr. Carter lowered his insulin dosage without consulting him. PSOAF to Ill. DSOF ¶ 18; R. 128-6, First Nov. 21, 2011 Grievance. Carter emerges in Waldrop's deposition testimony as the physician who admitted Waldrop to the infirmary about a week after Dubrick allegedly cut off Waldrop's insulin. Waldrop Dep. Tr. at 61:20-22. Waldrop testified that Carter changed Waldrop's insulin dosage while he was admitted to "a lot lower than the dosage I was normally taking." *Id.* at 77:8-19

(stating that he thought Carter lowered the dose from "35 units" to "below like 20 units or something like that"). Waldrop added, however, that he himself refused the dosage during the "first 24 hours" because he "was pissed off." *Id.* at 79:5-8. As with the second through fourth grievances, McBee issued a Grievance Officer's Report on this grievance in February 2012 and the Review Board denied it in March 2012. PSOAF to Ill. DSOF ¶¶ 19-20; Ill. Defs.' Resp. to PSOAF ¶ 19.

### E. Sixth Grievance: Carter and Forced Isolation

Waldrop's sixth and final grievance, also dated November 21, 2011, complained that, under Dr. Carter's direction, Waldrop was confined in isolation in the infirmary against his will for four days. PSOAF to Ill. DSOF ¶ 21. The grievance states that Waldrop was forcibly admitted to the hospital and kept there in retaliation for filing his earlier grievances. R. 128-7, Sec. Nov. 21, 2011 Grievance. Waldrop testified at his deposition that Carter admitted him to the hospital for a reason Waldrop did not know and Waldrop was taken to the infirmary by a guard, despite his not wanting to go. Waldrop Dep. Tr. at 27:8-28:19. Again, McBee issued her Grievance Officer's Report in February 2012, and the Review Board denied the grievance in March 2012. PSOAF to Ill. DSOF ¶¶ 22-23; Ill. Defs.' Resp. to PSOAF ¶ 22.

### F. Garcia's Involvement

The final Defendant, who has so far gone unmentioned, is Nurse Cynthia Garcia. Garcia is currently the Director of Nursing at Stateville and was also employed by Wexford. Wexford DSOF ¶ 61. The Defendants assert that Garcia was

never involved in Waldrop's treatment of care, *id.* ¶ 62; Waldrop responds that Garcia became involved in his case by reviewing his medical file and writing three memoranda advising that Waldrop's grievances (numbers four, five, and six) be denied, R. 137, Pl.'s Resp. to Wexford DSOF ¶ 62. It was part of Garcia's job to assist the Grievance Officer by reviewing and evaluating medical files in relation to inmates' grievances. Wexford DSOF ¶ 63.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th

Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Discussion

### A. Failure to Exhaust as to the Illinois Defendants and Nurse Garcia

Waldrop's deliberate indifference claims against the Illinois Defendants, McBee and Trevino, and Garcia (the nurse employed by Wexford), must be dismissed because he did not exhaust his administrative remedies against them specifically. In the Prison Litigation Reform Act (PLRA), Congress directed that "[n]o action shall be brought with respect to prison conditions … by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted).

To successfully exhaust, a prisoner must "complete the administrative review process in accordance with the applicable procedural rules" set by his prison's grievance process. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *accord Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) ("[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies, and thus is foreclosed by § 1997e(a) from litigating."). In Waldrop's case, that administrative process is set

by Illinois law, which requires that a prisoner "first attempt to resolve incidents, problems, or complaints … through his or her counselor," failing which, "the individual may file a written grievance … within 60 days after the discovery of the incident, occurrence, or problem[.]" 20 Ill. Admin. Code § 504.810(a). The grievance form must be addressed to the prison's Grievance Officer and "contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint." *Id*. § 504.810(b). While the prisoner need not include the name of a complained-of individual if it is unknown, he "must include as much descriptive information about the individual as possible." *Id.* The Grievance Officer then reviews the grievance and reports her findings to the Chief Administrative Officer, who advises the prisoner of a decision in writing "within 2 months after receipt of the written grievance, where reasonably feasible under the circumstances." *Id*. § 504.830(d). The prisoner may appeal this decision to the Director, who determines if the matter requires a hearing before the Administrative Review Board, which submits to the Director a written report on its findings and recommendations. *Id*. §§ 504.850(a)-(b), (e). The Director then makes a final determination in writing, to be completed within 6 months after the grievance is appealed. *Id*. § 504.850(f).

From the record, it is clear that Waldrop did not even *begin* to seek any administrative relief, let alone exhaust it, as to McBee, Trevino, and Garcia. While the grievances name Miller, Dubrick, and Carter, and their alleged indifference to

Waldrop's need for insulin at various incidents, they never name McBee, Trevino, or Garcia. Nor do they include any descriptive information or facts that would remotely suggest that these three were the "subject of or … otherwise involved" in his complaints. Still, Waldrop argues, "McBee and Trevino were involved with the denial of [his] medical care" because: McBee was "on notice" of Waldrop's "improper medical treatment" by virtue of the grievances, yet "delayed in addressing" them, never "render[ing] a response to" Waldrop; and, Trevino wrote a memo recommending dismissal of the second and third grievances and was "personally involved in establishing the medical policy at Stateville with respect to Mr. Waldrop's continued treatment, or lack thereof." R. 129, Pl.'s Resp. to Ill. Defs.' Br. at 5-6. Waldrop reasons that the fact that he continued to file grievances (presumably numbers four through six, which were filed in November 2011, one year after the first grievance) even after McBee and Trevino did not find in his favor constituted "evidence of his discontentment with the grievance process and accordingly, with these Defendants." *Id*. at 6. Waldrop recycles the exact argument to assert that he exhausted as to Garcia. R. 139, Pl.'s Resp. to Wexford Defs.' Br. at 5 ("Waldrop continued to file grievances based on his inadequate medical treatment after Defendant Garcia had already rendered her opinions to the contrary. Mr. Waldrop's additional grievances are certainly evidence of his discontentment with the grievance process and accordingly, with this Defendant.").

In other words, Waldrop attempts to pull McBee, Trevino, and Garcia into the ambit of his six grievances on this premise that he *impliedly* complained about

the three individuals because of their role in reviewing them in the first place. The Court is not convinced. First of all, Waldrop's reasoning (that continued filings suggest his desire to inculpate anyone who reviewed prior ones) lacks foundation for Garcia, because the record does not show that he did in fact file any further grievances after the ones in which she was involved (numbers Four through Six). More fundamentally, if Waldrop's complaint was truly that these three were somehow purposefully complicit in denying him insulin along with the named health professionals, nothing prevented him from articulating this belief in one of his later grievances.

True, those grievances would have been made about the very individuals whose job it would be to review them, but it was nonetheless necessary under the PLRA to put the prison administration on notice of Waldrop's accusations. Indeed, regardless of who reviewed them initially (even had McBee, Trevino, and Garcia not been recused as the subjects of complaint), these grievances would have been reported to the Chief Administrative Officer and ultimately the Director and Review Board. Without this step, contrary to Waldrop's view, he cannot be said to have "alerted prison officials to the nature of his problem and g[iven] them an opportunity to resolve it." *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005). Waldrop's reliance on *Jones v. Bock*, 549 U.S. 199 (2007), is misplaced. *Jones* held that courts could not read into the PLRA a rule that exhaustion is "*per se* inadequate simply because an individual later sued was not named in the grievances"; the grievance process in that case, for instance, did not have such a

requirement, only that prisoners "be as specific as possible" about those involved. *Id.* at 218-19. Here, Waldrop was required, even if he did not provide names, to give "descriptive information" about "what happened, when, where" and by whom. 20 Ill. Admin. Code § 504.810(b). He did not attempt to lay out *any* of this information about the involvement of McBee, Trevino, and Garcia, centered on their apparently intentional deficient administrative review of his grievances—which, despite Waldrop's characterization now, is different in substance from the complaints he did file about denial of insulin by medical professionals.

Worth noting is that even if Waldrop's claims against McBee, Trevino, and Garcia were not precluded on exhaustion grounds, they would not survive for a trial on the merits in any event. The thrust of Waldrop's issue with McBee is what he calls delays in processing his grievances and how she never provided him with a copy of her reports. According to the record and Waldrop's own allegations, McBee issued her Grievance Officer's reports about three months after the filing of each of Waldrop's grievances (one of which ended in Waldrop's favor). The procedures provide that the Grievance Officer must make her written reports to the Chief Administrative Officer, who then advises the prisoner of an initial decision within two months. 20 Ill. Admin. Code § 504.830(d). McBee did not process the grievances fast enough for a decision to be made in two months, but that deadline was subject to the caveat of "where reasonably feasible under the circumstances." *Id*. All Waldrop has tried to add to the record is his conclusory allegation that McBee "delayed"; without anything more about the circumstances, and Waldrop provides

nothing despite having the tools of discovery at his disposal, a jury has no basis to find that McBee's processing-time of three, rather than two, months rose to the level of unconstitutionally deliberate indifference. As for the fact that Waldrop never received a copy of McBee's reports, nothing in the procedures required this step, because it is the Chief Administrative Officer and Director who ultimately inform the prisoner in writing of grievance decisions. *See id.* §§ 504.830(d), 504.850(f). And all that Trevino and Garcia did, as far as the record shows, was draft memoranda reviewing Waldrop's grievances. Aside from disagreeing with their recommendation to rule against him, Waldrop has shown nothing about their content reflecting deliberate indifference on their part, rather than their informed opinion. Moreover, Trevino was involved in the second and third grievances, which, as described above, were not even related to his claims here of being denied insulin.

This is not to suggest that personnel involved in the prison administrative review process could never be found liable for indifferent medical treatment. "One can imagine a complaint examiner doing her appointed tasks with deliberate indifference to the risks imposed on prisoners," such as "routinely sen[ding] each grievance to the shredder without reading it," for instance, or "intervene[ing] to prevent the medical unit from delivering needed care." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (citing cases). But Waldrop has shown nothing of the kind. What Waldrop has described is three examiners doing their jobs (within a reasonable timeframe as far as the record shows) albeit reaching conclusions he disagrees with—nothing more.

## B. Insufficient Evidence as to the Remaining Wexford Defendants

## 1. Dubrick, Carter, and Miller

It is uncontested that Waldrop did exhaust his administrative remedies as to the other Wexford Defendants (aside from Garcia). As explained next, however, there is no triable issue about whether the conduct of Dubrick, Carter, and Miller constituted unconstitutionally deliberate indifference.

Prison officials have an obligation under the Eighth Amendment to provide adequate medical care to the incarcerated. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A prisoner can show that this obligation has been breached by establishing, first, that the "deprivation alleged [is], objectively, sufficiently serious" and, second, that the depriving official had a "sufficiently culpable state of mind." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (internal quotation marks omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Hudson v. McMillian*, 503 U.S. 1, 5 (1992) ("[T]he appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited 'deliberate indifference.'"). This subjective element requires more than a showing of mere negligence or inadvertent error; it demands "the denial or delay of medical care" in the face of "a defendant's actual knowledge of, or reckless disregard for, a substantial risk of harm." *Vance*, 97 F.3d at 992 (explaining that Supreme Court has adopted recklessness standard used in criminal law). "[A]ctual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).

Accordingly, "a plaintiff inmate need not prove that a defendant *intended* the harm that ultimately transpired or *believed* the harm would occur." *Vance*, 97 F.3d at 992.

To begin, there is no question that, as an objective matter, denying a diabetic insulin can constitute an objectively serious deprivation.[5] But Waldrop has not compiled a record that would enable a reasonable jury to find that any of his health providers in fact recklessly subjected him to a substantial risk of harm, even viewing the evidence in his favor. According to the record, Nurse Miller refused to administer insulin to Waldrop on precisely one occasion, in November 2010, because he did not undergo an accu-check test. Although Waldrop alleged in his amended complaint a host of physical problems, *see, e.g.,* Am. Compl. ¶ 40 (eye damage, kidney failure, artery disease, *etc.*), he has pointed to no evidence (there is no expert testimony, for instance) that he in fact suffered these ailments or, more importantly, that they were somehow tied to Miller's failure to administer insulin on that one date.[6]

---

[5]The Wexford Defendants describe the mere fact that Waldrop has brought this lawsuit as an "affront" to the Court. R. 125, Wexford Defs.' Br. at 2; R. 140, Wexford Defs.' Reply Br. at 19. Although the Wexford Defendants are entitled to their opinion on the merits of the claims, the Court does not consider the attempt by an individual to assert his rights to be an "affront" to the judiciary, even if Waldrop ultimately is wrong and there is no triable issue.

[6]The Wexford Defendants contend that "all of the testimony in the record supports Nurse Miller's action" in denying insulin because Waldrop refused to first have his blood sugar tested. Wexford Defs.' Br. at 6-7. But the Wexford Defendants cite to nothing in the record to support this assertion. Indeed, the record reflects at least one health professional's testimony suggesting that Miller did *not* necessarily have to withhold the insulin based on Waldrop's refusal to be accu-checked. R. 138-1, Payne Dep. Tr. at 12:12-16. The issue of when an accu-check is required before insulin is administered is thus not resolvable one way or the other based on the record the parties have submitted, although it does not have to be resolved because of Waldrop's failure to demonstrate any kind of risk of harm.

Nor has he shown any evidence that he was subjected to any kind of actual risk by Dubrick and Carter. Dubrick took Waldrop off his usual insulin shots for a period of a few days, putting him on what Waldrop refers to as "pills" instead. Those pills were glipizide; according to Dubrick's testimony, that is a medication that serves as a short-term alternative to insulin that, while not ideal for type-1 diabetes in the long run, was necessary because of Waldrop's refusal to undergo blood-sugar tests. R. 128-2, Dubrick Dep. Tr. at 26:10-24. Dubrick testified that he prescribed the glipizide because he felt it was the best course of treatment in the situation, where Waldrop was refusing to let a proper diagnostic take place. *Id.* at 26:10-28:23 ("I felt it was very dangerous to administer insulin to [Waldrop] in an unmonitored situation[.]"). Waldrop offers nothing to rebut this medical expert's testimony that the treatment in question was appropriate.

Similarly, although Waldrop takes issue with Carter's orders that he be admitted to solitary care in the infirmary and be given a lower dosage of insulin, Waldrop offers no evidence to show that this action was harmful. Carter testified that he ordered Waldrop to be admitted based on reports that Waldrop's blood sugar was being "poorly controlled" and because admitting the patient provides "a better opportunity to adjust his medicine … and monitor[ ] him around the clock." R. 124-1, Carter Dep. Tr. at 43:15-24. Waldrop offers nothing to question this medical opinion, aside from his displeasure at being ordered to the infirmary. And while Carter and Waldrop dispute whether Waldrop's insulin dosage was actually lowered, *compare* Carter Dep. Tr. at 50:1-8 *with* Waldrop Dep. Tr. at 77:8-19, this

disagreement is immaterial. Even accepting Waldrop's non-expert speculation that his dosage was lowered from "35 units" to "20 units or something like that," Waldrop Tr. at 77:17-19, he has no evidence that a risk of harm arose as a result of the lowered dosage.

In sum, Waldrop has presented no basis for a jury to infer that any of these individuals had "knowledge of a substantial risk of serious harm" to Waldrop but went ahead with their actions anyway, nor could a jury find that he was subjected to any kind of "obvious[ ]" risk. *Haley*, 86 F.3d at 641. Summary judgment is accordingly warranted for Waldrop's claims against Dubrick, Carter, and Miller.

### 2. Wexford

Waldrop's claim against Wexford Health Sources itself fares no better. "[A] corporate entity violates an inmate's constitutional rights if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation and internal quotation marks omitted). In contrast to a common-law theory like vicarious liability, which holds corporate defendants liable for the acts and omissions of their employees, § 1983 liability only attaches where a corporate "policy or custom" was "the 'direct cause' or 'moving force' behind the constitutional violation."[7] *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530-31 (7th Cir. 2000) (citing *City of Oklahoma v.*

---

[7]This standard is the same as the one governing municipal liability. A corporation contracted to perform "the public function of running a jail" or otherwise "acting under color of state law … is treated the same as a municipality for purposes of § 1983." *Woodward*, 368 F.3d at 927 n.1 (citing *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002)).

*Tuttle*, 471 U.S. 808, 820 (1985)); *but see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794-95 (7th Cir. 2014) (suggesting that "new approach may be needed" that opens up private employers to *respondeat superior* liability rather than applying § 1983 analysis). A plaintiff must show that there was an express policy, "a widespread, though unwritten, custom or practice," or a decision made by an employee with "final policymaking authority" that caused his injury. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (quoting *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009)).

Waldrop argues that Wexford's liability can be demonstrated indirectly, by showing "a series of bad acts and inviting the court to infer from them that the policymaking level of [the corporation] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned" the misconduct. Pl.'s Resp. to Wexford Defs.' Br. at 11 (quoting *Woodward*, 368 F.3d at 927) (alteration in original). That recitation of law is correct, but as already discussed, Waldrop has not demonstrated the necessary bad acts by Wexford employees, producing no evidence that he was ever actually subjected to a risk of harm by the doctors and nurses employed by the company.

To try and fill this gap, Waldrop points to the observation by a different court in this District that there have been widespread "allegations from prisoners about Wexford's unconstitutional policies and practices, specifically with how Wexford constantly ignored complaints, letters and grievances." *Id.* at 12 (quoting *Watkins v. Ghosh*, 2014 WL 840949, at *6 (N.D. Ill. Mar. 4, 2014)). Waldrop also asks the Court

to take judicial notice of an independent monitoring report that questioned whether medical care at Stateville has been meeting industry standards. *Id.* at 13. This line of argument can be dismissed out of hand. Merely pointing to the existence of problems at the same facility as a *general* matter, as noted in other cases, is hardly an adequate means for a plaintiff to satisfy the burden at the summary judgment stage regarding *his* own particular claims. *See, e.g., Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (noting that a "vague statement about an occurrence affecting other inmates in a detention facility does not support the inference of a 'widespread' custom"). Because Waldrop has not actually produced any evidence that shows that Wexford had a policy or custom in place to deny inmates necessary insulin, summary judgment is granted as to the company.

## C. Defendants Would be Entitled to Qualified Immunity

Finally, for the sake of completeness, the Court notes that even if Waldrop's claims against the individual Defendants not been thwarted on the grounds already discussed, they would be precluded in any case by the doctrine of qualified immunity.[8] "Qualified immunity shields [officials] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Leaf v. Shelnutt*, 400 F.3d 1070, 1079-80 (7th Cir. 2005) (citation and alterations omitted). To overcome a defense of qualified

_____

[8]Whether medical personnel employed by a private corporation like Wexford, as opposed to state employees, are entitled to assert qualified immunity is a live question. *See Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (suggesting that they may not, but not deciding the issue); *but see Shields*, 746 F.3d at 794 (suggesting in dicta that they may). Assuming the Wexford Defendants could assert it along with the Illinois Defendants, they would be entitled to summary judgment on the defense.

immunity, a plaintiff must "make out a violation of a constitutional right" and show that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (specifying that courts have discretion in which of these two prongs to address first). As such, it must be shown that the "violation was so clear that an official would realize he or she was violating an inmate's constitutional rights" with or without a prior legal case that put them on such notice. *Borello v. Allison*, 446 F.3d 742, 750 (7th Cir. 2006). Here, even if the evidence could be said to show that Defendants' treatment of Waldrop rose to the level of unconstitutional indifference and Waldrop had properly exhausted his claims, there is no basis for a jury to find that the various Defendants realized that they were committing such a violation. That Waldrop offers nothing to rebut Defendants' testimony that they believed they were providing reasonable care given Waldrop's intransigence precludes such a finding, for instance. *See id.* ("The purpose of the second step of the qualified immunity analysis is to ensure that prison officials will not be held personally liable for their official conduct when they were not aware that their conduct violated any of an inmate's constitutional rights."). Accordingly, summary judgment would be appropriate on qualified immunity grounds for the named individual Defendants, as an alternate ground.

## IV. Conclusion

For the reasons given above, the Defendants' motions for summary judgment are granted.

ENTERED:

_____ s/Edmond E. Chang _____
Honorable Edmond E. Chang
United States District Judge

DATE: June 3, 2015